**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

               Plaintiff,

v.                                CRIMINAL ACTION NO. 2:24-cr-00096

BRIAN MCDEVITT,

               Defendant.

**AMENDED ORDER**

On May 22, 2025, the Court held a hearing on objections to the presentence report ("PSR"). (ECF No. 137.)  At the hearing, the Court ordered the parties to file briefings on the objections relating to relevant conduct and the Safety Valve.  Upon taking the briefings and oral argument under advisement, the Court issues the findings below on the objections.

## *I.*    *BACKGROUND*

Following a jury trial, Brian McDevitt ("Defendant"), was convicted of two counts of illegally distributing Hydrocodone, a Schedule II controlled substance (on May 17, 2022, and March 29, 2024), and illegally distributing Alprazolam, a Schedule IV controlled substance (on May 18, 2022, and March 29, 2024) to an individual with the initials "B.M" in violation of 21 U.S.C. § 841(a)(1).  (ECF No. 108.)  Defendant was acquitted of the remaining thirteen counts, including a charge for maintaining a drug-involved premises ("Count Seventeen").  (*Id.*)  In Objection #2 of the Presentence Investigation Report ("PSR"), Defendant objects to "any drug

weight other than the four counts of conviction being attributed as relevant conduct." (PSR at 28–30.) In Objection #3 of the PSR, Defendant objects to "the PSR's failure to note his eligibility for the Safety Valve under § 5C1.2 and the corresponding 2-level reduction under § 2D1.1(b)(18)." (*Id.* at 30–31.) Following the Court's order for briefing on the objections, the parties submitted four filings. (ECF Nos. 138, 139, 148, 149.) Defendant's objections are addressed below.

## II.    DISCUSSION

### A. Objection #2 – Relevant Conduct

The PSR attributes 17.31 grams of Hydrocodone and 1,578 units of Alprazolam to Defendant as relevant conduct. (PSR at ¶ 37.) Upon conversion, this results in 116.075 kilograms of converted drug weight ("CDW"). (PSR at ¶ 41.) This calculation includes all prescriptions of Alprazolam and Hydrocodone in the Prescription Drug Monitoring Program (PDMP) Database for patient B.M. from April 14, 2022, through June 7, 2024. (*Id.* at ¶ 30.) The parties do not dispute that Defendant is responsible for the drug weight attributable to his four counts of conviction, which is 3.5 kilograms of CDW[1]. (ECF No. 149 at 9.)

#### 1. The Parties' Arguments

Defendant objects to the inclusion of any drugs outside of the four counts of conviction. (PSR at 28–30.) In support of his objection, Defendant argues that the Government failed to identify any testimony from office manager Crystal Frye regarding prescriptions issued to B.M. outside of Chapmanville Medical Center ("CMC") and failed to identify any testimony from its expert, Dr. Thomas, as to the legality of any prescription aside from the four counts of conviction. (ECF No. 149 at 1.) According to Defendant, these failures show that the Government cannot

---

[1] The drugs attributable to the counts of conviction are calculated as follows: 42 units of Alprazolam x 0.0625 grams = 2.625 grams of CDW; 525 milligrams of Hydrocodone x 6,700 grams = 3,517.5 grams; Total = 3,520.125 grams.

prove his uncharged prescriptions to B.M. would "fall outside of the umbrella" of Count Seventeen (for which Defendant was acquitted).   (*Id.*)

Pursuant to the acquitted conduct guideline in U.S.S.G. § 1B1.3(c), Defendant argues that Defendant's acquittal on Count Seventeen "necessarily leads to the conclusion that the jury did not believe that Dr. McDevitt engaged in criminal conduct, specifically distributing controlled substances not for a legitimate medical purpose and outside the usual course of professional practice, other than the four prescriptions for which he was convicted."   (*Id.* at 2.)   Defendant further argues that the acquittal on Count Seventeen "indicates that the jury believed [Defendant's] default was the legitimate practice of medicine and that illegal drug dealing was the exception." (*Id.*)

Additionally, Crystal Frye testified that she never delivered a prescription to B.M. outside of the CMC premises.   (ECF No. 142 at 193:18–24.)   This testimony, Defendant alleges, "falls far short of decoupling any prescriptions from CMC to a sufficient extent to remove them from the Acquitted Conduct umbrella of Count Seventeen."   (ECF No. 149 at 3.)   Applying this same logic to Dr. Thomas, Defendant argues that he "cannot place any prescriptions to B.M. outside the umbrella of CMC, rendering any other theory irrelevant in light of the acquittal on Count Seventeen."   (*Id.* at 4.)   Defendant argues that even if the Government can place other prescriptions within that umbrella, "not all prescriptions were written under the same conditions . . . and each prescription represents a discrete transaction."   (*Id.* at 5.)

Defendant also argues that the Government's attempt to distinguish Count Seventeen falls short because "for purposes of the Guidelines, sentences for operating a drug premises are inextricably tied to the underlying drug trafficking conduct."   (*Id.* at 7.)

3

Finally, Defendant argues that a public comment by the Committee on Criminal Law of the Judicial Conference "permits courts to fashion appropriate sentences where a jury returns an inconsistent verdict and [gives] courts the tools necessary to parse what conduct should be considered and what should be disregarded when a jury returns a mixed verdict on charges based on overlapping factual conduct." (*Id.* at 8.) Defendant argues that his case is analogous to the Committee on Criminal Law's example of an inconsistent verdict between a drug conspiracy and substantive drug distribution count. (*Id.*) Defendant concludes by arguing that "because his issuing of prescriptions for Alprazolam and Hydrocodone on the charged dates . . . 'establishes . . . in whole . . . the instant offense[s] of conviction,' then that conduct, and only that conduct, may be considered as relevant conduct." (*Id.*)

In response to Defendant's objection, the Government argues that its trial theory supports counting all Hydrocodone and Alprazolam prescriptions to B.M. as relevant conduct. (ECF No. 148 at 6.) According to the Government, "it was outside the scope of professional medical practice for [Defendant] to switch B.M. to Hydrocodone\Alprazolam\Gabapentin in the first place, and it was further outside the scope of professional medical practice for [Defendant] to continue to prescribe B.M. the same controlled substances that B.M. was regularly screening negative for while testing positive for illicit street drugs." (*Id.*) The Government also points to the testimony and exhibits presented at trial—arguing that they—did not focus on just the four counts of conviction, but rather presented a "full picture" of Defendant's distribution relationship to B.M. (*Id.*) Evidence the Government points to includes: B.M.'s prescription history; Crystal Frye's testimony about B.M.'s "special treatment" and negative drug screens; and Dr. Thomas' testimony regarding the negative drug screens and the switch of B.M.'s prescriptions. (*Id.* at 3–6.)

4

The Government further argues that the acquittal under Count Seventeen is irrelevant because 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 856 are "distinct crimes with different elements." (*Id.* at 7.)   According to the Government, § 841 focuses on "the legality of controlled substances distributions" while § 856 focuses on "the intended use of property."   (*Id.*)   The Government asserts that the acquittal on Count Seventeen has nothing to do with the distributions to B.M. and notes that the jury convicted Defendant of every charged distribution to B.M.   (*Id.*)   The Government also contends that if relevant conduct only applied to charged distributions, then Defendant would have to be charged with "94 separate counts related to B.M.   Multiplied by eight patients, this would in theory result in an approximately 800-count indictment."   (*Id.* at 7–8.)

Finally, the Government argues that the Sentencing Guidelines make distinctions between §§ 841 and 856 because convictions under § 841 are sentenced under § 2D1.1, whereas convictions under § 856 are sentenced under § 2D1.8.   (*Id.* at 8.)   The Government notes that if a defendant is convicted under both crimes, the defendant would be sentenced under § 2D1.1 with a 2-point enhancement for maintaining a drug premises under § 2D1.1(b)(12).   (*Id.*)

*2. Analysis*

Relevant conduct includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."   U.S.S.G. § 1B1.3(a)(2). "[D]espite the limited scope of conduct for which the defendant was convicted, he may nonetheless be sentenced more broadly for relevant conduct."   *United States v. McVey*, 752 F.3d 606, 610 (4th Cir. 2014).   Offenses may qualify as the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."   U.S.S.G. § 1B1.3 cmt. n.5(B)(ii).   Factors for considering relevant

conduct "include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.* However, "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." U.S.S.G. § 1B1.3(c).

Here, simply put, Defendant was acquitted of maintaining a drug-involved premises, he was not acquitted of distributing controlled substances to B.M. Official commentary to § 1B1.3(c) states that "[a]cquitted conduct is unique, and this amendment does not comment on the use of *uncharged*, dismissed, *or other relevant conduct* as defined in § 1B1.3 for purposes of calculating the guideline range." United States Sentencing Commission Notice, 89 Fed. Reg. 36,855 (May 3, 2024) (emphasis added). Furthermore, while Defendant is correct that sentences for operating a drug premises are "tied to the underlying drug trafficking conduct," sentences for distributing controlled substances are *not* tied to operating a drug premises. (ECF No. 149 at 6.) When explained in the context of a street dealer, Defendant's argument becomes even less persuasive. If a street dealer is charged with distribution counts and a premises count for distributing drugs inside a home and elsewhere, an acquittal on the premises count doesn't mean that the drugs sold from inside the home aren't counted as relevant conduct.

The Sentencing Commission further explains that "while 'acquitted conduct' cannot be considered in determining the guideline range, any conduct that establishes—in whole or in part— the instant offense of conviction is properly considered, even as relevant conduct and *even if that same conduct also underlies a charge of which the defendant has been acquitted*." U.S.S.C. Notice, 89 Fed. Reg. 36,855 (May 3, 2024) (emphasis added). Through this, the Sentencing

6

Commission makes clear that conduct can be considered in sentencing even if it underlies a charge of which the defendant has been acquitted—such as drugs underlying a premises count.   (*Id.*) Regardless of the underlying conduct, because Defendant was acquitted of a premises charge and not acquitted of distribution charges to B.M., his objection falls short.

Defendant's argument that Crystal Frye's and Dr. Thomas' testimony "cannot place any prescriptions to B.M. outside the umbrella of CMC, rendering any other theory irrelevant in light of the acquittal on Count Seventeen," also falls short.   (ECF No. 149 at 4.)   As discussed, because Defendant was acquitted of a premises charge and not a distribution charge, the acquittal has no impact on relevant conduct surrounding distributions to B.M.   Furthermore, the testimony from Dr. Thomas is consistent between the counts of conviction and uncharged distributions to B.M. For example. Dr. Thomas testified that Defendant's action in switching B.M. to Hydrocodone and Alprazolam was "completely inappropriate" and testified that subsequent negative drug screens were consistent with diversion to the black market, yet the prescriptions continued.   (ECF No. 143, Trial Tr. at 60–65.)

The distribution counts that Defendant was convicted of were at the beginning and end of the Hydrocodone and Alprazolam distributions to B.M.   Therefore, it necessarily follows that because the initial prescription switch was outside the scope of professional medical practice, and because continuing the prescriptions despite negative tests was also outside the scope of professional medical practice, the distributions in between followed that same pattern.[2]   Thus, the

---

[2] The jury found Defendant guilty of unlawfully prescribing Hydrocodone to B.M. on May 17, 2022, and Alprazolam on May 18, 2022.   (ECF No. 108, at 2.)   The jury also found Defendant guilty of unlawfully prescribing Hydrocodone and Alprazolam to B.M. on March 29, 2024.   (*Id.* at 3.)   Out of an abundance of caution, the Court has not considered any prescriptions before May 17, 2022, and after March 29, 2024, in its consideration of relevant conduct.   Although the PSR considers some prescriptions to B.M. that fall outside of this timeframe (PSR at ¶ 30), limiting the timeframe does not change the Guidelines calculation, which would mean Defendant's BOL is still 24 pursuant to §2D1.1(c)(8) of the Guidelines.

other distributions to B.M. may be considered as relevant conduct because they "were part of the same course of conduct or common scheme or plan as the offense of conviction."    U.S.S.G. § 1B1.3(a)(2).

Finally, from a policy and practicality standpoint, Defendant's interpretation of § 1B1.3(c) would, in effect, require the Government to bring a charge for every single prescription that was distributed if the Government is also bringing a premises charge.    Otherwise, an acquittal on a premises charge would render each prescription unavailable as relevant conduct.    As the Government noted, for B.M. alone this would result in ninety-four charged counts.    (ECF No. 148 at 6–7.)    This would render a majority of §1B1.3, and the concept of relevant conduct, a dead letter.    Based on the evidence presented, the Government has met its burden and proved by a preponderance of the evidence that the uncharged distributions are relevant conduct.    *See United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008).    Defendant's objection is **OVERRULED**.

### B.  *Objection #3 – Safety Valve*

The PSR does not note Defendant's eligibility for the Safety Valve under § 5C1.2 and the corresponding 2-level reduction under § 2D1.1(b)(8).    To be eligible for the Safety Valve, five elements must be met.    U.S.S.G. § 5C1.2.    The only element at dispute is the fifth element, which requires the defendant, by the time of sentencing, to have "truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan."    *Id.*    "The defendant's burden under the Safety Valve is a true burden of proof that rests, at all times, on the defendant.    To carry his burden, the defendant must persuade the district court that he has made full, truthful disclosure of information required by the safety valve."    *United States v. Aidoo*, 670 F.3d 600, 607 (4th Cir.

2012). When the government opposes application of the Safety Valve, a defendant cannot carry his burden without presenting some kind of evidence. *Id.*

### 1. *The Parties' Arguments*

Defendant argues that he provided, pursuant to a search warrant, all information that he has regarding his treatment of B.M. and has no other relevant or useful information for the Government. (PSR at 30.) Defendant notes that he has the initial burden but argues that when a defendant has come forward with sufficient evidence to demonstrate that he has made a complete and truthful disclosure, the burden then "shifts to the Government to present some sound reason why the defendant's disclosure is either incomplete and/or untruthful." (ECF No. 139 at 2.) Defendant argues that he has complied with his burden by "credibly asserting that he has provided complete and truthful disclosure by virtue of his production of all of B.M.'s medical records pursuant to the search warrant." (*Id.*)

Next, Defendant argues that the holding from *United States v. Ivester* must be read in a specific context. (*Id.* at 2–3.) *Ivester* addressed the question of "whether pursuant to § 3553(f), defendants are required to affirmatively act to inform the government of their crimes, or whether it is sufficient that they are willing to be completely truthful although the Government never attempts to obtain the information." 75 F.3d 182, 184 (4th Cir. 1996). The Fourth Circuit held that the "plain and unambiguous language obligates defendants to demonstrate, through affirmative conduct, that they have supplied truthful information to the Government." *Id.* at 184–85. Defendant argues that "[r]ead in that context, the requirement of 'affirmatively' providing information does not distinguish between actively providing information (e.g., by way of a proffer)

and passively providing information (e.g., by way of a search warrant), but between actually providing information and being willing to provide information."   (ECF No. 139 at 3.)

Defendant also argues that *Ivester* does not require a defendant to plead guilty to be eligible for the Safety Valve.   (*Id.*)   Defendant concedes that *Ivester* states "Section 3553(f)(5) requires more than accepting responsibility for one's own acts," but argues that such language is dicta and should not be relied upon to deny him Safety Valve relief.   (*Id.*)   Defendant argues that not only is going to trial not a bar for Safety Valve relief, but a "defendant's commission of perjury while at trial is also not a bar to safety valve relief."   (*Id.* at 4) (citing *United States v. Jeffers*, 329 F.3d 94, 99 (2d Cir. 2003)).   Defendant further argues that the Safety Valve does not specify the form, place, or manner of disclosure, and argues that a defendant may comply without submitting to a debriefing.   (*Id.* at 5.)   Defendant also notes that there are "many practical reasons why a debrief would be detrimental to a defendant's position," including Fifth Amendment concerns.   (*Id.* at 6.)

In response to Defendant's Safety Valve objections, the Government argues that Defendant did not voluntarily provide any information to the Government, therefore Defendant did not demonstrate through affirmative conduct that he supplied truthful information.   (ECF No. 138 at 2.)   According to the Government, the Safety Valve "is designed to give defendants sentencing credit when they come forward, accept responsibility for their conduct, and provide complete and truthful information to the government concerning their crimes," and asserts that "plainly did not occur here."   (*Id.*)   The Government argues that Defendant "chose to fight rather than cooperate with the investigation" at every step, and notes that while he is constitutionally entitled to fight, he in-turn cannot receive the sentencing credit for "truthfully provid[ing] all information and evidence" to the Government concerning the offenses of conviction.   (ECF No. 148 at 9.)

Finally, the Government argues that Defendant's position "rests on the faulty premise that the information seized from McDevitt by search warrant was the only information that the government required concerning its investigation into the offenses of conviction." (*Id.* at 8.) The Government asserts that the offenses of conviction "concerned diversion of dangerous prescription drugs (Schedule II narcotics) from [Defendant] into the Chapmanville Community," and the investigation would have benefitted from additional context concerning Defendant's relationship with B.M.

### 2. Analysis

Defendant has the burden to persuade this Court that he has made a "full, truthful disclosure of information required by the safety valve." *Aidoo*, 670 F.3d at 607. Defendant's failure to provide the Government with *any* information outside of what was required by a search warrant does not meet this burden. To receive relief under the fifth prong, "[a] defendant must make an *affirmative effort* to disclose to the government *everything* he knows concerning the offense or offenses involved." *United States v. Salgado*, 94 F.App'x 142, 143 (4th Cir. 2004) (citing *Ivester*, 75 F.3d at 184-85) (emphasis added). This is a "tell-all provision that requires the defendant to truthfully supply details of [his] own culpability." *United States v. Nyadzor*, 474 F.App'x 323, 325 (4th Cir. 2012) (quoting *Aidoo*, 670 F.3d at 609). Not only did Defendant not engage in a "tell-all," he engaged in a "tell-nothing."

First, Defendant's argument that he has no information to provide outside of what the Government already obtained through a search warrant is unpersuasive. While the collected medical records provide most of the story surrounding Defendant's distributions to B.M., they do not provide the full story. This is evidenced by the fact that the Government requested a

debriefing with Defendant *following* his convictions.   (ECF No. 148 at 8-9.)   Furthermore, the

medical records in the Government's possession do not "truthfully supply details of [Defendant's]

own culpability," as noted by the Fourth Circuit in *Nyadzor* and *Aidoo*.   474 F.App'x at 325; 670

F.3d at 609.   Rather, Defendant maintains that he has zero culpability because he has not accepted

responsibility for any conduct and has told the Probation Office that he is "the victim" in this case.

(PSR at ¶ 34.)

Furthermore, while Defendant is correct that multiple Circuit Courts of Appeal have held

that a defendant may comply with the Safety Valve requirements without submitting to a

debriefing, they "play[] an important role in permitting a defendant to comply with the disclosure

requirement of the safety valve provision and in convincing the Government of the fullness and

completeness of a defendant's disclosure, thereby encouraging a favorable recommendation."

*United States v. Beltran-Ortiz*, 91 F.3d 665, 669 (4th Cir. 1996).   Additionally, Defendant's

argument about the meaning of "affirmative effort" in *Ivester* falls short because Courts have often

interpreted this to mean an active and voluntary effort.   *See United States v. Hamerter*, 91 F.App'x

261, 264 (4th Cir. 2004) ("[b]ecause [Defendant] did not avail himself of the opportunities he had

to disclose the information he possessed, the district court did not clearly err in finding that he had

failed to qualify for the safety valve"); *United States v. Ruffin*, 204 F.App'x 165, 166 (4th Cir.

2006) ("[Defendant's] failure to volunteer information about [a customer] amply supports the

district court's conclusion that [Defendant] had not been completely truthful in his interview and

its decision to deny him . . . the Safety Valve").

Finally, this Court agrees with Defendant's argument that going to trial does not preclude

him from receiving the benefit of the Safety Valve because he had the opportunity to provide all

information before sentencing.    However, Defendant has not provided anything after his conviction.    In summary, to receive relief under the fifth prong, Defendant must do more than nothing.    Defendant's objection is **OVERRULED**.

### III.    CONCLUSION

Defendant's Objections are **OVERRULED**.    Sentencing in this matter is set for **January 15, 2026.**

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        January 14, 2026

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

13